Craig A. Brandt (SBN 133905)
LAW OFFICE OF CRAIG A. BRANDT
5354 James Avenue
Oakland, CA  94618
Telephone:  (510) 601-1309
Email:  craigabrandt@att.net

Hans W. Herb (SBN 136018)
LAW OFFICE OF HANS W. HERB
P.O. Box 970
Santa Rosa, CA  95402
Telephone:  (707) 576-0757
Email:  hans@tankman.com

Attorneys for Plaintiff
EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>LAPTALO ENTERPRISES, INC, dba JL PRECISION, a California corporation; JAKOV LAPTALO, an individual; MICHAEL LAPTALO, an individual; CARL ITALIANO, an individual; and DOES 1-10, inclusive,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |

Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC  ("EDEN") hereby

brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the

Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*

COMPLAINT – Page 1

## INTRODUCTION

1.      This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and remediation against Defendants for current and ongoing violations of the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

2.      On or about June 22, 2018, EDEN provided a Notice of Defendants' violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board") and (4) Defendants, as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.      A copy of EDEN's Notice of Intent to Sue is attached hereto as Exhibit "A".

4.      More than sixty days have passed since EDEN's Notice was served on Defendants, the State Board, and the Regional and National EPA Administrators.  EDEN is informed and believes, and thereupon alleges, that neither the National EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

## JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

6.   Venue is proper because Defendants reside in and the events or omissions giving rise to EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the Facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

**PARTIES**

7.   Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") is an environmental membership group organized under the laws of the State of California. Its members work to protect, enhance, and assist in the restoration of rivers, creeks, streams, wetlands, vernal pools, and their tributaries located in California.  Members of EDEN reside and work near the Sacramento-San Joaquin Delta and the San Francisco Bay and its tributaries, and use those waters and their watersheds for recreation, sports, fishing, swimming, hiking, photography, nature walks and scientific study. Their use and enjoyment of these natural resources are specifically impaired by defendant's violations of the CWA.

8.   Defendants' ongoing violations of the General Permit and the CWA will cause irreparable harm to EDEN and its members, for which they have no plain, speedy, or adequate remedy. The relief requested will redress the ongoing injury in fact to EDEN and its members.

9.   EDEN is informed and believes, and on such information and belief alleges, that Defendant LAPTALO ENTERPRISES, INC., dba JL PRECISION, located at 2360 Zanker Road, in San Jose, California ("the San Jose Facility"), was formed on or about October 28, 1992 as a California corporation, and is identified in the Regional Board's records as the Industrial General Permit applicant and operator of the San Jose Facility.

10.   EDEN is informed and believes, and on such information and belief alleges, that Defendant LAPTALO ENTERPRISES, INC., dba JL PRECISION, while headquartered in San

Jose, has a second facility located at 1325 El Pinal Drive, in Stockton, California ("the Stockton Facility"), which was opened on or about June 28, 2017.

11. EDEN is informed and believes, and on such information and belief alleges that Defendant JACOV LAPTALO is the Chief Executive Officer for both the San Jose and Stockton Facilities according to the documents on file with the Secretary of State, and is the San Jose Facility's Legally Responsible Person, according to Regional Water Board records.

12. EDEN is informed and believes, and on such information and belief alleges that Defendant CARL ITALIANO is the manager and the Duly Authorized Representative for both the San Jose and Stockton Facility according to the documents on file with the Regional Board.

13. EDEN is informed and believes, and on such information and belief alleges, that Defendant MICHAEL LAPTALO is the legal owner of the property located at 2360 Zanker Road, San Jose, California, as well as the property located at 1325 El Pinal Drive in Stockton, California; and is Defendant Laptalo Enterprises, dba JL Precision's Lessor/Landlord for both the San Jose and the Stockton facilities.

14. On June 22, 2018, EDEN first provided Notice to Defendant MICHAEL LAPTALO of his Lessee/Tenant's ongoing violations of the General Permit and the CWA. Defendant MICHAEL LAPTALO failed to respond to EDEN's Notice.

15. Defendants continued to violate the General Permit and the CWA after Defendant MICHAEL LAPTALO received Notice of Defendant Laptalo Enterprises' violations, as evidenced by documents and records contained in the public database of the California Environmental Protection Agency, State Water Resources Control Board's Storm Water Multiple Application and Report Tracking System (SMARTS).

16.    Plaintiff is informed and believes, and thereupon alleges, that Defendant MICHAEL LAPTALO had actual knowledge of Defendant Laptalo Enterprises' violations of the General Permit and the CWA, coupled with sufficient control over Defendant Laptalo Enterprises due to the terms of the lease between Defendant MICHAEL LAPTALO and Defendant Laptalo Enterprises, but nevertheless failed to require that his tenant comply with applicable environmental laws, including the General Permit and the CWA.

**STATUTORY BACKGROUND**

17.    Congress declared that the Federal Clean Water Act was designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through federal and state cooperation to develop and implement "programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).

18.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

19.    Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

20.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

General Permit

21.     The State Board elected to issue a statewide general permit for industrial storm water discharges. The State Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The State Board reissued the General Permit on April 17, 1997, and again on April 1, 2014 (the "2015 Permit" or "General Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The 1997 Permit was in effect between 1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

22.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

23.     The General Permit contains several prohibitions. Effluent Limitation V(A) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

24.     Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the

environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

25.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity which have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

26.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit, § X(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

27.     To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, § X(B).

28.     Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet § I(1).

29.     Sections X(D) – X(I) of General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges.

30.     The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit, § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

31.     The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  General Permit, § X(H)(4), (5).

32.     The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program. The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

33.    As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

34.    Section XI(B) of the General Permit requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the Facility SWPPP.

35.    A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.  General Permit §XI(B)(2)

36.    Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload into SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit §XI(B)(4)

37.    Facilities are also required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  General Permit, § XI.A.

38.    The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, § XV.

39.     Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, as well as additional parameters indicated in the Permit by facility type and those parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit, § XI(B)(6)(c).

40.     The US EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.

41.     The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks. The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

42.     The following annual NALs have been established under the General Permit for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("s.u."); total suspended solids ("TSS") – 100 mg/L; oil & grease ("O&G") – 15 mg/L; iron – 1.0 mg/L, nitrite + nitrate as nitrogen --.68 mg/L, zinc -- .26 mg/L, aluminum – .75 mg/L.

43.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single

parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH. General Permit §XII(A)

44.     When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status." General Permit § XII(C)

45.     For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background. General Permit §XII(D)

46.     Section XVI(A) of the General Permit requires that all Dischargers must certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS.

San Francisco Bay Regional Basin Plan

47.     The Water Quality Control Board, San Francisco Bay Region has adopted the "San Francisco Bay Basin (Region 2) Water Quality Control Plan" ("Basin Plan"), as amended by Resolution No. R2-2010-0100, setting forth the Water Quality Standards ("WQS") and beneficial uses for San Francisco Bay and its tributaries.

48.     The Beneficial Uses for San Francisco Bay are: industrial service supply, shellfish harvesting, fish migration, preservation of rare and endangered species, fish spawning, commercial and sportfishing, estuarine habitat, wildlife habitat, recreational activities involving

contact with water,  recreational activities involving proximity to water, and navigation. *See* Basin Plan, Table 2-1.

49.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

50.     Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife. Discharges of pollutants at levels above WQS contribute to the impairment of the Beneficial Uses of the waters receiving the discharges.  WQS applicable to dischargers covered by the Storm Water Permit include, but are not limited to, those set out in the Basin Plan and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

51.     The Basin Plan sets forth, among other things, narrative WQS for floating material, O&G, sediment, settleable matter, and suspended materials, and sets forth numeric WQS for pH, arsenic, cadmium, chromium VI, copper, cyanide, lead, mercury, nickel, selenium, silver, tributyltin, zinc, and PAHs. *See* Basin Plan §§ 3.3.6, 3.3.7, 3.3.9, 3.3.12-3.3.14, 3.3.21, and Table 3-3.

52.     The Basin Plan also includes site specific objectives ("SSOs"), which are WQS for specific sites, for certain pollutants of concern, including copper and nickel. *See* Basin Plan, Table 3-3A.  The CTR includes numeric criteria set to protect human health and the environment in the State of California. Water Quality Standards.

53.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQS are violations of Receiving Water Limitations in Section VI(A) of the General Permit.

Central Valley Region Basin Plan

54.     The Regional Board has identified beneficial uses of the Central Valley Region's waters and established water quality standards for the Sacramento River and its tributaries and the Sacramento-San Joaquin Delta in "The Water Quality Control Plan (Basin Plan) for the California Regional Water Quality Control Board, Central Valley Region – The Sacramento River Basin and The San Joaquin River Basin," generally referred to as the Basin Plan, and the "Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary."

55.     The beneficial uses of these waters include, among others, domestic and municipal supply, water contact recreation, non-contact water recreation, wildlife habitat, warm and cold freshwater habitat, and fish spawning. The non-contact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but where there is generally no body contact with water, nor any likelihood of ingestion of water. These uses include, but are not limited to, picnicking, sunbathing, hiking, camping, boating. . . hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."

56.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life."

57.     The Basin Plan provides that water shall not contain floating material in amounts that cause nuisance or adversely affect beneficial uses.

58.     The Basin Plan provides that water shall be free of discoloration that causes nuisance or adversely affects beneficial uses.

59.     The Basin Plan provides that waters shall not contain suspended materials in concentrations that cause nuisance or adversely affect beneficial uses.

60.     The Basin Plan also prohibits the discharges of oil and grease, stating that waters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses.

61.     The Basin Plan provides that at a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) specified in the following provisions of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals) and 64431-B (Fluoride) of Section 64431, Table 64444-A (Organic Chemicals) of Section 64444, and Tables 64449-A (Secondary Maximum Contaminant Levels-Consumer Acceptance Limits) and 64449-B (Secondary Maximum Contaminant Levels-Ranges) of Section 64449.

62.     Title 22 of the California Code of Regulations provides a MCL for aluminum of 1.0 mg/L, for Cadmium of .01 mg/L, and lead of .05 mg/L.

63.     The Basin Plan provides that the pH shall not be depressed below 6.5 nor raised above 8.5; that iron levels not exceed .30 mg/L; that zinc not exceed .10 mg/L; that copper not exceed .0056 mg/L, and that cadmium not exceed .00022 mg/L.

64.     The Basin Plan requires that waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses."

65.     Table III-1 of the Basin Plan provides a water quality objective ("WQO") for iron of 0.3 mg/L.

Citizen Suit Provision of the CWA

66.     Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation." 33 U.S.C. §1365(a)(1). No action may be commenced prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator of the EPA, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A).  By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

67.     In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the district court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a).  Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192 per day for each violation." 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI.Q.1.

68.     Violations of provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

## FACTUAL ALLEGATIONS WHICH GIVE RISE TO CLAIMS

69.     Defendant Laptalo Enterprises, dba JL Precision manufactures precision sheet metal and machining custom framing at both its San Jose and Stockton facilities.  Operations include sheet metal fabrication, machining, welding, plating, painting and assembly.  EDEN is

informed and believes that the Facilities fall under standard industrial classification ("SIC") codes 3479 (Coating, Engraving and Allied Services), 3599 (Industrial and Commercial Machinery and Equipment) and 3444 (Sheet Metal Work).

70.     EDEN is informed and believes that Laptalo Enterprises stores large quantities of industrial materials outdoors at both Facilities that can be exposed to storm water, eroded by wind, and otherwise contaminate the surrounding watershed.

71.     Based on EDEN's investigation, including a review of the San Jose Facility's Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"), SWPPP, aerial photography, and EDEN's information and belief, storm water is collected and discharged from the Facility through a series of channels that discharge via at least one outfall. The outfall discharges storm water and pollutants contained in that storm water directly into Coyote Creek, which flows into the San Francisco Bay.

72.     Based on EDEN's investigation of the Stockton Facility, storm water is collected and discharged from the Facility through a series of channels that discharge via at least one outfall. The outfall discharges storm water and pollutants contained in that storm water directly into the Calaveras River, which flows into the San Joaquin River, part of the Sacramento-San Joaquin Delta Watershed.

73.     Plaintiff is informed and believes, and thereupon alleges that the storm water flows over the surface of the San Jose and Stockton facilities where industrial activities occur and areas where airborne materials associated with the industrial processes at the facility may settle onto the ground.   Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the storm water channels.

74.     On information and belief, Plaintiff alleges that the majority of storm water discharges from the San Jose and Stockton facilities contain storm water that is commingled with runoff from areas at the facilities where industrial processes occur.

75.     On information and belief, Plaintiff alleges that there are insufficient structural storm water control measures installed at the Facilities.  Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facilities are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.

76.     The Facilities lack sufficient structural controls to prevent rainfall and storm water flows from coming into contact with exposed areas of contaminants, and to prevent the discharge of water once contaminated. The Facilities lack adequate storm water pollution treatment technologies to treat storm water once contaminated.

Failure to Apply for NPDES Coverage Under the General Permit

77.     Defendant Laptalo Enterprises, dba JL Precision began operations at the San Jose Facility on or about October 28, 1992.

78.     Defendant Laptalo Enterprises, dba JL Precision began operations at the Stockton Facility on or about June 28, 2017.

79.     Defendants' SIC codes require it to obtain NPDES coverage under the General Permit.

80.     Defendants failed to apply for continuing NPDES coverage under the 2015 General Permit by the deadline.  Thus, their NPDES permit coverage was terminated by the Regional Water Board on August 15, 2015.

81.     Between August 15, 2015, and December 18, 2015, Defendants operated the San Jose Facility without obtaining NPDES coverage under the 2015 General Permit.   Between those dates, the Facility discharged storm water into the San Francisco Bay without an NPDES permit and failed to take action to prevent or minimize such discharges, in violation of the CWA.

82.     Defendant Laptalo Enterprises has failed to date to apply for NPDES coverage under the General Permit for its Stockton Facility and is currently discharging storm water into the Calaveras River and the Sacramento-San Joaquin Delta Watershed from that facility without a Permit, in violation of the CWA.

Deficient/ Non-Existent SWPPP

83.     On information and belief, Plaintiff alleges that since at least July 1, 2015, Defendant has failed to implement an adequate SWPPP for the San Jose Facility.

84.     On information and belief, Plaintiff alleges that since at least June 28, 2017, Defendant has failed to implement any SWPPP for the Stockton Facility.

85.     Plaintiff is informed and believes, and thereupon alleges, that the SWPPP and Site Map prepared for the San Jose Facility on November 10, 2010, does not comply with the requirements of Sections X(E), X(D)(2)(d), X(H), X(D), X(A)(9) of the General Permit.

86.     Plaintiff is informed and believes, and thereupon alleges that the San Jose Facility's SWPPP dated November 12, 2010, does not set forth site-specific best management practices for the Facility that are consistent with BAT or BCT for the Facility.

87.     Plaintiff is informed and believes, and thereupon alleges that the San Jose Facility's SWPPP dated November 12, 2010, fails to include an appropriate Monitoring Implementation Plan and does not comply with the requirements of Section XI of the General Permit.

88.     According to information available to EDEN, Defendants' San Jose SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges.

89.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed and continue to fail to alter the Facility's San Jose SWPPP and site-specific BMPs consistent with the General Permit.

90.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events into the San Francisco Bay, the Calaveras River and the Sacramento-San Joaquin Delta Watershed.

91.     Information available to Plaintiff indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from either the San Jose or the Stockton Facility due to the continued discharge of contaminated storm water. Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged in this Complaint are ongoing and continuing.

Monitoring and Reporting

92.     On information and belief, EDEN alleges that Defendants have inadequate monitoring programs at both the San Jose and Stockton Facilities.

93.     On information and belief, EDEN alleges that during the 2015-2016 reporting year, Defendants failed to collect and analyze two storm water samples from the first half of the reporting year and two storm water samples from the second half of the reporting year for its San Jose Facility.

94.     On information and belief, EDEN alleges that during the 2016-2017 reporting year, Defendants failed to collect and analyze two storm water samples from the first half of the

reporting year and two storm water samples from the second half of the reporting year for its San Jose Facility.

95.    On information and belief, EDEN alleges that during the 2017-2018 reporting year, Defendants failed to collect and analyze two storm water samples from the first half of the reporting year and one storm water sample from the second half of the reporting year for its San Jose Facility.

96.    On information and belief, EDEN alleges that Defendants have failed to collect and analyze any storm water samples at its Stockton Facility since it opened on June 28, 2017.

97.    On information and belief, EDEN alleges that Defendants have failed to conduct monthly visual observations of storm water discharges at the San Jose Facility since July 1, 2015.

98.    On information and belief, EDEN alleges that Defendants have failed to conduct monthly visual observations of storm water discharges at the Stockton Facility since July 1, 2017.

Failure to File Timely Annual Reports

99.    EDEN is informed and believes that Defendants have failed to comply with Section XVI(A) of the General Permit, which provides that Dischargers shall certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS.

100.   Specifically, Defendants' Annual Report for the San Jose Facility for the reporting year 2015-16 was due on or before July 15, 2016.   To date, Defendants have failed to file the 2015-16 Annual Report for the San Jose Facility.

101.     Defendants' Annual Report for the San Jose Facility for the reporting year 2016-17 was due on or before July 15, 2017.   Defendants did not submit the Annual Report the San Jose Facility for the reporting period 2016-17 until August 1, 2018.

102.     Defendants' Annual Report for the San Jose Facility for the reporting year 2017-18 was due on or before July 15, 2018.   Defendants did not submit the Annual Report the San Jose Facility for the reporting period 2017-18 until August 1, 2018.

103.     To date, Defendants have failed to file Annual Reports for the Stockton facility for the reporting periods 2016-17 and 2017-18.

Failure to Implement BAT/BCT and BMPs

104.     EDEN is informed and believes that Defendants have failed to identify and implement Best Management Practices ("BMPs") at either the San Jose or the Stockton Facility that comply with the requirements of the General Permit for best conventional treatment (BCT) for conventional pollutants, and best available technology (BAT) for toxic and non-conventional pollutants. These technology-based pollution controls are required to be implemented in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.  General Permit §§ I(C), V(A).

105.     For example, the San Francisco Bay Regional Water Board inspected the San Jose Facility on December 22, 2017, and noted the Facility was failing to implement proper BMPs, including failing to limit sediment tracking through the Facility and failing to repair the parking lot, which was breaking up and was riddled with pot holes.

106.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the San Jose Facility to Coyote Creek, a tributary of San Francisco Bay.

107.    Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Stockton Facility to Calaveras River, a tributary of the San Joaquin River and the Sacramento-San Joaquin Delta Watershed.

Discharges of Contaminated Storm Water

108.    In the past five years, the San Jose Facility has sampled and analyzed its storm water run-off only once, on April 6, 2018, and that storm water sample was not for the required parameters of zinc, nitrates, iron and aluminum.

109.    The Stockton Facility has not sampled and analyzed any storm water run-off since it first began operations at the Facility in June of 2017.

110.    Neither the San Jose nor the Stockton facility has developed and implemented adequate BMPs, SWPPPs or monitoring programs.  Furthermore, the Stockton facility does not currently have an NPDES permit, and thus all its discharges are unauthorized and in violation of the General Permit.

111.    Based on the foregoing, EDEN alleges that Defendants have discharged storm water containing excessive levels of TSS, zinc, nitrates, iron and aluminum from both the San Jose and the Stockton facility to their respective Receiving Waters during at least every significant local rain event over 0.1 inches in the last five (5) years.

**FIRST CAUSE OF ACTION**
**Failure to Apply for NDPES Coverage under the General Permit**
**Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

112.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

113.     The General Permit contains, in Attachment A, a list of Standard Industrial Classification (SIC) Codes which indicate the types of facilities which must apply for coverage under the General Permit.

114.     Defendant Laptalo Enterprises' SIC Codes for its San Jose and Stockton facilities (reflecting its primary operations) are included among those industries which must apply for General Permit coverage.

115.     Defendants operated without General Permit coverage at the Laptalo Enterprises, dba JL Precision San Jose Facility between August 15, 2015, and December 18, 2015.

116.     Defendants have failed to date to apply for General Permit coverage for the Laptalo Enterprises, dba JL Precision Facility in Stockton.

117.     Each day since at least August 15, 2015, that Defendants failed to apply for General Permit coverage in violation of the General Permit is a separate and distinct violation of the General Permit against all Defendants. Noncompliance with the General Permit constitutes a violation of the CWA against all Defendants.  General Permit § XXI.A; 33 U.S.C. § 1342.

**SECOND CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

118.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

119.     The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP.

120.     As outlined herein, Defendants have failed to develop and implement an adequate SWPPP for the Laptalo Enterprises, dba JL Precision facility in San Jose.

121.    Defendants have failed to develop and implement any SWPPP for the Laptalo Enterprises, dba JL Precision facility in Stockton.

122.    Each day since July 1, 2015, that Defendants have failed to develop, implement and update adequate SWPPPs for the San Jose and Stockton facilities is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

### THIRD CAUSE OF ACTION
### Failure to Develop and Implement an
### Adequate Monitoring and Reporting Program
### (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

123.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

124.    The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

125.    As outlined herein, Defendants have failed to develop and implement an adequate monitoring and reporting program for either the San Jose or the Stockton facility.

126.    Defendants' ongoing failure to develop and implement an adequate monitoring and reporting program at either the San Jose or Stockton facility is evidenced by failure to collect storm water samples at the facilities pursuant to the requirements of the General Permit and failure to conduct monthly visual observations at the facilities.

127.    Each day since at least July 1, 2015, that Defendants have failed to develop and implement an adequate monitoring and reporting program for either the San Jose or the Stockton facility in violation of the General Permit is a separate and distinct violation of the General

Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants. The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

128.     Noncompliance with the General Permit constitutes a violation of the CWA against all Defendants. General Permit § XXI.A; 33 U.S.C. § 1342.

**FOURTH CAUSE OF ACTION**
**Failure to Submit Timely Annual Reports to the Regional Water Board**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

129.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

130.     The General Permit requires that all Dischargers certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year.

131.     As delineated herein, Defendants have failed to date to file the San Jose facility's Annual Report for the reporting year 2015-16, which was due to be filed on or before July 15, 2016.

132.     As delineated herein, Defendants failed to file the San Jose facility's Annual Report for the reporting year 2016-17 by July 15, 2017.

133.     As delineated herein, Defendants failed to file the San Jose facility's Annual Report for the reporting year 2017-18 by July 15, 2018.

134.     As delineated herein, Defendants have failed to date to file an Annual Report for the reporting years 2016-17 and 2017-18 for its Stockton facility, which were due by July 15, 2017 and July 15, 2018, respectively.

135.     Each day since July 16, 2016, that Defendants failed to submit Annual Reports to the Regional Water Board in a timely manner is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

**FIFTH CAUSE OF ACTION**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

136.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

137.     The General Permit's SWPPP requirements and Effluent Limitation V(A) of the General Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

138.     Defendants have failed to implement BAT and BCT at either the San Jose or the Stockton Facility for discharges of Iron, TSS, Zinc, Nitrates, Aluminum, and other potentially un-monitored pollutants, in violation of Effluent Limitation V(A) of the General Permit.

139.     Each day since at least July 1, 2015, that Defendants have failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants and is an ongoing and continuous violation.

**SIXTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

140.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

141.     Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water VI(B) of the General Permit prohibits storm water

discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

142.    Plaintiff is informed and believes, and thereupon alleges, that since at least July 1, 2015, Defendants have been discharging polluted storm water from both the San Jose and the Stockton Facilities, in excess of applicable water quality standards in violation of Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit.

143.    During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at both facilities, becoming contaminated with iron, sediment, zinc, nitrates, aluminum and other potentially un-monitored pollutants at levels above applicable water quality standards.  The storm water then flows untreated into Coyote  Creek, the Calaveras River, the San Joaquin River and the Sacramento-San Joaquin Delta Watershed, and the San Francisco Bay.

144.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and the applicable Regional Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

145.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations of the General Permit.

146.     Every day since at least July 1, 2015, that Defendants have discharged and continues to discharge polluted storm water from the San Jose and the Stockton Facilities in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.  These violations are ongoing and continuous.

### RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.     Declare Defendants to have violated and to be in violation of the CWA;

2.     Issue an injunction ordering Defendants to immediately operate the San Jose and Stockton facilities in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.     Enjoin Defendants from discharging pollutants from Defendant Laptalo Enterprises' San Jose and Stockton facilities to the surface waters surrounding the facilities, until such time as Defendants have developed and implemented adequate SWPPPs and implemented appropriate BMPs at the facilities;

4.     Order Defendants to pay civil penalties of $51,570 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.     Order Defendants to take appropriate actions to restore the quality of United States waters impaired by its activities at Laptalo Enterprises' facilities in San Jose and Stockton;

6.     Order Defendants to pay EDEN's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law; and;

7.      Award such other and further relief as may be just and proper.

Dated:  September 5, 2018                    Respectfully,


By: ___/S/_____
     Craig A. Brandt
     Attorney for Plaintiff

**EXHIBIT "A"**



**EDEN**

*Eden Environmental Citizen's Group*

June 22, 2018

Michael J. Laptalo        mlaptalo@jlprecision.com
JL Precision
1325 El Pinal Drive
Stockton, CA  95205

Via US Mail, Certified

Edgar Barcena
Laptalo Enterprises, Inc.
dba JL Precision
2360 Zanker Road
San Jose, CA  95131

**Re:    60-Day Notice of Violations and Intent to File Suit Under the Federal Water
        Pollution Control Act ("Clean Water Act")**

To Officers, Directors, Operators, Property Owners and/or Facility Managers of Laptalo
Enterprises, Inc., dba JL Precision – Stockton:

        I am writing on behalf of Eden Environmental Citizen's Group ("EDEN") to give legal
notice that EDEN intends to file a civil action against Laptalo Enterprises, Inc., dba JL Precision
("Discharger") and Michael J. Laptalo ("Property Owner") for violations of the Federal Clean
Water Act ("CWA" or "Act") 33 U.S.C. § 1251 *et seq.,* that EDEN believes are occurring at the
JL Precision facility located at 1325 El Pinal Drive in Stockton, California ("the Facility" or "the
site").

        EDEN is an environmental citizen's group established under the laws of the State of
California to protect, enhance, and assist in the restoration of all rivers, creeks, streams, wetlands,
vernal pools, and tributaries of California, for the benefit of its ecosystems and communities.

        CWA section 505(b) requires that sixty (60) days prior to the initiation of a civil action
under CWA section 505(a), a citizen must give notice of intent to file suit. 33 U.S.C. § 1365(b).

2151 Salvio Street #A2-319                    Concord, CA  94520
Telephone: 925-732-0960                        Email: *edenvcitizens@gmail.com*

Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the State in which the violations occur.

As required by CWA section 505(b), this Notice of Violation and Intent to File Suit provides notice to the Discharger of the violations which have occurred and continue to occur at the Facility. After the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, EDEN intends to file suit in federal court against the Discharger and the Property Owner under CWA section 505(a) for the violations described more fully below.

## I.      THE SPECIFIC STANDARD, LIMITATION, OR ORDER VIOLATED

EDEN's investigation of the Facility has uncovered significant, ongoing, and continuous violations of the CWA and the General Industrial Storm Water Permit issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board ("SWRCB")] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ ("1997 Permit") and by Order No. 2014-0057-DWQ ("2015 Permit") (collectively, the "General Permit").

Information available to EDEN indicates that on or around June 28, 2017, JL Precision opened its Stockton facility. However, to date, the Stockton facility does not have a Notice of Intent to be authorized to discharge storm water from the Facility under the General Permit.

As more fully described in Section III, below, EDEN alleges that in its operations of the Facility, the Discharger has committed ongoing violations of the substantive and procedural requirements of the Federal Clean Water Act, California Water Code §13377; the General Permit, the Regional Water Board Basin Plan, the California Toxics Rule (CTR) 40 C.F.R. § 131.38, and California Code of Regulations, Title 22, § 64431.

## II.     THE LOCATION OF THE ALLEGED VIOLATIONS

### A.  **The Facility**

The location of the point sources from which the pollutants identified in this Notice are discharged in violation of the CWA is JL Precision's permanent facility address of 1325 El Pinal Drive in Stockton, California.

JL Precision manufactures precision sheet metal and machining custom framing. Operations include sheet metal fabrication, machining, welding, plating, painting and assembly. Facility operations are covered under Standard Industrial Classification Codes (SIC) 3479 (Coating, Engraving and Allied Services) 3599 (Industrial and Commercial Machinery and Equipment) and 3444 (Sheet Metal Work).

Based on the EPA's Industrial Storm Water Fact Sheet for Sector AA – Fabricated Metal Products, polluted discharges from operations at the Facility contain galvanized metals such as zinc, nickel and chromium; heavy metals, such as iron, copper and aluminum; toxic metals, such as lead and cadmium; total suspended solids ("TSS"); chemical oxygen demand (COD; nitrates and nitrites; phosphates; chlorinated solvents; and oil and grease ("O&G"). Many of these pollutants are on the list of chemicals published by the State of California as known to cause cancer, birth defects, and/or developmental or reproductive harm.

### B. The Affected Receiving Waters

The Facility discharges into a municipal storm drain system, which then discharges to the Calaveras River, which flows into the San Joaquin River ("Receiving Waters").

The San Joaquin River is a water of the United States. The CWA requires that water bodies such as the San Joaquin River meet water quality objectives that protect specific "beneficial uses." The Central Valley Regional Water Board has issued its *Water Quality Control Plan for the Sacramento and San Joaquin River Basins* ("Basin Plan") to delineate those water quality objectives.

The Basin Plan identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses for the Receiving Waters downstream of the Facility include: Municipal and Domestic Supply (MUN), Agricultural Supply (AGR), Industrial Process Supply (PRO), Industrial Service Supply (IND), Navigation (NAV), Water Contact Recreation (REC-1), Non-contact Water Recreation (REC-2), Warm Freshwater Habitat (WARM), Cold Freshwater Habitat (COLD), Wildlife Habitat (WILD), Migration (MIGR), and Spawning, Reproduction, and/or Early Development (SPWN).

Furthermore, the Calaveras River is listed for water quality impairment on the most recent 303(d)-list for the following: chlorpyrifos; Diazinon, Mercury, and Pathogens. A water body is impaired pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), when its Beneficial Uses are not being achieved due to the presence of one or more pollutants. Polluted storm water and non-storm water discharges from industrial facilities, such as the Facility, contribute to the further degradation of already impaired surface waters, and harm aquatic dependent wildlife.

### III.   VIOLATIONS OF THE CLEAN WATER ACT AND GENERAL PERMIT

#### A. *Failure to Apply For NPDES Coverage*

The CWA prohibits storm water discharges without a permit. 33 U.S.C. § 1342; 40 C.F.R. § 122.26. The General Permit regulates operators of facilities subject to coverage under

the National Pollutant Discharge Elimination System (NPDES) storm water permit, as these operators discharge storm water associated with specific industrial activities identified by both industrial activity and SIC (Standard Industrial Classification) codes in Attachment A of the Permit.

The Discharger's primary industrial activity is listed on Attachment A as an industrial activity subject to NPDES coverage. Thus, the Facility was required to apply for coverage under the General Permit in order to commence business operations, pursuant to Section I.Q of the Permit.

According to EDEN's investigation, JL Precision commenced its operations at the site on or before June 28, 2017. However, to date, the Discharger has failed to apply for General Permit coverage. Thus, between June 28, 2017, and the present, the Facility has operated without NDPES Permit coverage. During that time, the Facility has not complied with any of the terms of the Permit, including implementing Best Management Practices, collecting and analyzing storm water runoff for pollution parameters, preparing and implementing a Storm Water Pollution Prevention Plan, or filing Annual Reports.

Permit noncompliance constitutes a violation of the Clean Water Act and the Water Code, is grounds for enforcement action against the Facility and is further a violation of Sections I. and II.B.1.b. of the General Permit.

### B. *Failure to Implement and Upload a Compliant SWPPP and Site Map*

The Discharger has failed to implement a Storm Water Pollution Prevention Plan ("SWPPP") and to upload a compliant SWPPP and Site Map for the Facility into the SMARTS system, as required in Section X of Order No. 2014-0057-DWQ.

Failure to develop or implement an adequate SWPPP is a violation of Sections II.B.4.f and X of the General Permit.

### C. *Failure to Develop and Implement a Monitoring and Reporting Program Pursuant to the General Permit*

Section XI of the General Permit requires Dischargers to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting industrial activities.

The objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and it must be evaluated and revised whenever appropriate to ensure compliance with the General Permit.

1. Failure to Conduct Visual Observations

Section XI(A) of the General Permit requires all Dischargers to conduct visual observations at least once each month, and sampling observations at the same time sampling occurs at a discharge location.

Observations must document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, odor and the source of any pollutants. Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants in storm water discharges.

EDEN alleges that between July 1, 2017, and the present, the Discharger has failed to conduct monthly and sampling visual observations pursuant to Section XI(A) of the General Permit.

2. Failure to Collect the Required Number of Storm Water Samples

In addition, EDEN alleges that the Discharger has failed to provide the Regional Water Board with the minimum number of annual documented results of facility run-off sampling as required under Sections XI.B.2 and XI.B.11.a of Order No. 2014-0057-DWQ, in violation of the General Permit and the CWA.

Section XI.B.2 of the General Permit requires that all Dischargers collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

Section XI.C.6.b provides that if samples are not collected pursuant to the General Permit, an explanation must be included in the Annual Report.

As of the date of this Notice, the Discharger has failed to upload into the SMARTS database system:

a. Two storm water sample analyses for the time period July 1, 2017, through December 31, 2017. Qualified Storm Events occurred in the vicinity of the facility on the following relevant dates: 10/19/17, 11/8/17, 11/15/17, and 11/27/17; and

b. Two storm water sample analyses for the time period January 1, 2018, through June 30, 2018. Qualified Storm Events occurred in the vicinity of the facility on at least the following relevant dates: 1/3/18, 1/8/18, 1/22/18, 1/24/18, 2/26/18, 3/1/18, 3/8/18, 3/13/18, 3/20/18, 4/6/18, 4/16/18 and 5/25/18.

### D. *Failure to File Annual Reports*

The Discharger has failed to comply with Section XVI.A of the General Permit, which provides as follows: "The Discharger shall certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS."

The Discharger's Annual Report for the reporting year 2016-17 was due on or before July 15, 2017. To date, the Discharger failed to file an Annual Report for the reporting year 2016-17.

### E. *Deficient BMP Implementation*

Sections I.C, V.A and X.C.1.b of the General Permit require Dischargers to identify and implement minimum and advanced Best Management Practices ("BMPs") that comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability.

EDEN alleges that since June 28, 2017, the Discharger has been conducting industrial activities at the site without adequate BMPs to prevent resulting non-storm water discharges. Non-storm water discharges resulting from these activities are not from sources that are listed among the authorized non-storm water discharges in the General Permit, and thus are always prohibited.

The Discharger's failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each and every day the Facility discharges storm water without meeting BAT and BCT.

### F. *Discharges In Violation of the General Permit*

Except as authorized by Special Conditions of the General Permit, Discharge Prohibition III(B) prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. Unauthorized non-storm water discharges must be either eliminated or permitted by a separate NPDES permit.

Information available to EDEN (including its review of publicly available data) indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

EDEN alleges that the Discharger has discharged storm water containing excessive levels of pollutants from the Facility to its Receiving Waters during at least every significant local rain event over 0.1 inches since June 28, 2017.

EDEN hereby puts the Discharger on notice that each time the Facility discharges prohibited non-storm water in violation of Discharge Prohibition III.B of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

The violations discussed herein are derived from eye witness reports and records publicly available.  These violations are continuing.

### IV.    THE PERSON OR PERSONS RESPONSIBLE FOR THE VIOLATIONS

The entities responsible for the alleged violations are Latpalo Enterprises, Inc., dba JL Precision, as well as employees of the Discharger responsible for compliance with the CWA, and Michael J. Laptalo, the Property Owner.

### V.    THE DATE, DATES, OR REASONABLE RANGE OF DATES OF THE VIOLATIONS

The range of dates covered by this 60-day Notice is from at least June 28, 2017, to the date of this Notice.  EDEN may from time to time update this Notice to include all violations which may occur after the range of dates covered by this Notice.  Some of the violations are continuous in nature; therefore, each day constitutes a violation.

### VI.    CONTACT INFORMATION

The entity giving this 60-day Notice is Eden Environmental Citizen's Group ("EDEN").

Aiden Sanchez
EDEN ENVIRONMENTAL CITIZEN'S GROUP
2151 Salvio Street #A2-319
Concord, CA  94520
Telephone:  (925) 732-0960
Email:  Edenenvcitizens@gmail.com  (emailed correspondence is preferred)

EDEN has retained counsel in this matter as follows:

CRAIG A. BRANDT
Attorney at Law
5354 James Avenue
Oakland CA, 94618
Telephone:  (510) 601-1309
Email:  craigabrandt@att.net

To ensure proper response to this Notice, all communications should be addressed to EDEN's legal counsel, Mr. Craig A. Brandt.

## VII.    RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

As discussed herein, the Facility's discharge of pollutants degrades water quality and harms aquatic life in the Receiving Waters.  Members of EDEN live, work, and/or recreate near the Receiving Waters.   For example, EDEN members use and enjoy the Receiving Waters for fishing, boating, swimming, hiking, biking, bird watching, picnicking, viewing wildlife, and/or engaging in scientific study.  The unlawful discharge of pollutants from the Facility impairs each of these uses.

Further, the Facility's discharges of polluted storm water and non-storm water are ongoing and continuous.  As a result, the interests of EDEN's members have been, are being, and will continue to be adversely affected by the failure of the Discharger and Property Owner to comply with the General Permit and the Clean Water Act.

CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for un-permitted discharges of pollutants.  33 U.S.C. §§ 1365(a)(1) and (f), §1362(5).

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five (5) years prior to the date of the Notice Letter.  These provisions of law authorize civil penalties of $37,500.00 per day per violation for all Clean Water Act violations after January 12, 2009, and $51,570.00 per day per violation for violations that occurred after November 2, 2015.

In addition to civil penalties, EDEN will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.  Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), EDEN will seek to recover its litigation costs, including attorneys' and experts' fees.

## VIII.    CONCLUSION

The CWA specifically provides a 60-day notice period to promote resolution of disputes. EDEN encourages the Discharger, the Property Owner or their counsel to contact EDEN's counsel within 20 days of receipt of this Notice to initiate a discussion regarding the violations detailed herein.

During the 60-day notice period, EDEN is willing to discuss effective remedies for the violations; however, if the Discharger wishes to pursue such discussions in the absence of litigation, it is suggested those discussions be initiated soon so that they may be completed before the end of the 60-day notice period.  EDEN reserves the right to file a lawsuit if discussions are continuing when the notice period ends.

Very truly yours,

AIDEN SANCHEZ
Eden Environmental Citizen's Group

Copies to:

Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Executive Director
State Water Resources Control Board
P.O. Box 100
Roseville, CA 95812-0100

Jeff Sessions, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Regional Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Executive Director
Central Valley Regional Water Quality Board
11020 Sun Center Drive, Suite 200
Rancho Cordova, CA 95670



**EDEN**

*Eden Environmental Citizen's Group*

June 22, 2018

Via US Mail, Certified

Edgar Barcena
Laptalo Enterprises, Inc.
dba JL Precision
2360 Zanker Road
San Jose, CA  95131

Carl Italiano                  citaliano@jlprecision.com
Michael Laptalo            mlaptalo@jlprecision.com
Jacov Laptalo              jlaptalo@jlprecision.com
JL Precision
2360 Zanker Road
San Jose, CA  95131

**Re:     60-Day Notice of Violations and Intent to File Suit Under the Federal Water
Pollution Control Act ("Clean Water Act")**

To Officers, Directors, Operators, Property Owners and/or Facility Managers of Laptalo
Enterprises, Inc., dba JL Precision – San Jose:

I am writing on behalf of Eden Environmental Citizen's Group ("EDEN") to give legal
notice that EDEN intends to file a civil action against Laptalo Enterprises, Inc., dba JL Precision
("Discharger") and Jakov and Michael Laptalo and the Laptalo Family Trust ("Property Owner")
for violations of the Federal Clean Water Act ("CWA" or "Act") 33 U.S.C. § 1251 *et seq.,* that
EDEN believes are occurring at the JL Precision facility located at 2360 Zanker Road in San
Jose, California ("the Facility" or "the site").

EDEN is an environmental citizen's group established under the laws of the State of
California to protect, enhance, and assist in the restoration of all rivers, creeks, streams, wetlands,
vernal pools, and tributaries of California, for the benefit of its ecosystems and communities.

2151 Salvio Street #A2-319                Concord, CA  94520
Telephone: 925-732-0960                    Email:  *edenenvcitizens@gmail.com*

CWA section 505(b) requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), a citizen must give notice of intent to file suit. 33 U.S.C. § 1365(b). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the State in which the violations occur.

As required by CWA section 505(b), this Notice of Violation and Intent to File Suit provides notice to the Discharger of the violations which have occurred and continue to occur at the Facility.  After the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, EDEN intends to file suit in federal court against the Discharger and the Property Owner under CWA section 505(a) for the violations described more fully below.

## I.      THE SPECIFIC STANDARD, LIMITATION, OR ORDER VIOLATED

EDEN's investigation of the Facility has uncovered significant, ongoing, and continuous violations of the CWA and the General Industrial Storm Water Permit issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board ("SWRCB")] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ ("1997 Permit") and by Order No. 2014-0057-DWQ ("2015 Permit") (collectively, the "General Permit").

Information available to EDEN, including documents obtained from California EPA's online Storm Water Multiple Application and Reporting Tracking System ("SMARTS") indicates that on or around December 18, 2015, the Discharger submitted an NOI to be authorized to discharge storm water from the Facility under the 2015 Permit.   The SWRCB approved the NOI, and the Discharger was assigned Waste Discharger Identification ("WDID") number 2 43I022897.

As more fully described in Section III, below, EDEN alleges that in its operations of the Facility, the Discharger has committed ongoing violations of the substantive and procedural requirements of the Federal Clean Water Act, California Water Code §13377; the General Permit, the Regional Water Board Basin Plan, the California Toxics Rule (CTR) 40 C.F.R. § 131.38, and California Code of Regulations, Title 22, § 64431.

## II.     THE LOCATION OF THE ALLEGED VIOLATIONS

### A.  The Facility

The location of the point sources from which the pollutants identified in this Notice are discharged in violation of the CWA is JL Precision's permanent facility address of 2360 Zanker Road in San Jose, California.

JL Precision manufactures precision sheet metal and machining custom framing. Operations include sheet metal fabrication, machining, welding, plating, painting and

assembly.  Facility operations are covered under Standard Industrial Classification Codes
(SIC) 3479 (Coating, Engraving and Allied Services) 3599 (Industrial and Commercial
Machinery and Equipment) and 3444 (Sheet Metal Work).

Based on the EPA's Industrial Storm Water Fact Sheet for Sector AA – Fabricated Metal
Products, polluted discharges from operations at the Facility contain galvanized metals such as
zinc, nickel and chromium; heavy metals, such as iron, copper and aluminum; toxic metals, such
as lead and cadmium; total suspended solids ("TSS"); chemical oxygen demand (COD; nitrates
and nitrites; phosphates; chlorinated solvents; and oil and grease ("O&G").  Many of these
pollutants are on the list of chemicals published by the State of California as known to cause
cancer, birth defects, and/or developmental or reproductive harm.

## B.  The Affected Receiving Waters

The Facility discharges into a municipal storm drain system, which then discharges to
Coyote Creek, which flows into the San Francisco Bay/Pacific Ocean ("Receiving Waters").

The San Francisco Bay is a water of the United States.  The CWA requires that water
bodies such as the San Francisco Bay meet water quality objectives that protect specific
"beneficial uses."  The Regional Water Board has issued the San Francisco Bay *Basin Water
Quality Control Plan* ("Basin Plan") to delineate those water quality objectives.

The Basin Plan identifies the "Beneficial Uses" of water bodies in the region. The
Beneficial Uses for the Receiving Waters downstream of the Facility include: commercial and
sport fishing, estuarine habitat, fish migration, navigation, preservation of rare and endangered
species, water contact and noncontact recreation, shellfish harvesting, fish spawning, and
wildlife habitat.  Contaminated storm water from the Facility adversely affects the water quality
of the San Francisco Bay watershed and threatens the beneficial uses and ecosystem of this
watershed.

Furthermore, the San Francisco Bay is listed for water quality impairment on the most
recent 303(d)-list for the following: chlordane; dichlorodiphenyltrichloroethane (DDT); dieldrin;
dioxin compounds (including 2,3,7,8- tetrachlorodibenzo-pdioxin); furan compounds; invasive
species; mercury; polychlorinated biphenyls (PCBs); PCBs (dioxin-like); selenium, and trash.

A water body is impaired pursuant to section 303(d) of the Clean Water Act, 33 U.S.C.
§ 1313(d), when its Beneficial Uses are not being achieved due to the presence of one or more
pollutants.  Polluted storm water and non-storm water discharges from industrial facilities, such
as the Facility, contribute to the further degradation of already impaired surface waters, and harm
aquatic dependent wildlife.

## III.  VIOLATIONS OF THE CLEAN WATER ACT AND GENERAL PERMIT

### *A.  Untimely Application For NPDES Coverage*

The CWA prohibits storm water discharges without a permit. 33 U.S.C. § 1342; 40 C.F.R. § 122.26.  The General Permit regulates operators of facilities subject to coverage under the National Pollutant Discharge Elimination System (NPDES) storm water permit, as these operators discharge storm water associated with specific industrial activities identified by both industrial activity and SIC (Standard Industrial Classification) codes in Attachment A of the Permit.

The Discharger's primary industrial activity is listed on Attachment A as an industrial activity subject to NPDES coverage.  Thus, the facility was required to apply for coverage under the Permit in order to commence business operations, pursuant to Section I.Q of the Permit.

According to California Secretary of State records, JL Precision commenced its operations at the site on or before October 28, 1992.  The Facility had NPDES coverage under the 1997 Permit at some point subsequent to October 28, 1992, but failed to reapply for coverage under the 2015 by the deadline of August 14, 2015.  The Facility's NPDES coverage was terminated after the Regional Water Board sent out two Notices of Non-Compliance for its failure to complete the recertification process for permit coverage under the 2015 General Permit.

The Discharger did not in fact recertify for General Permit coverage until December 18, 2015.  Thus, between August 15, 2015, and December 18, 2015, the Facility operated without NDPES Permit coverage.  During that time, the Facility did not comply with any of the terms of the Permit, including implementing Best Management Practices, collecting and analyzing storm water runoff for pollution parameters, preparing and implementing a Storm Water Pollution Prevention Plan, or filing Annual Reports.

Permit noncompliance constitutes a violation of the Clean Water Act and the Water Code, is grounds for enforcement action against the Facility and is further a violation of Sections I. and II.B.1.b. of the General Permit.

### *B.  Deficient/Invalid SWPPP and Site Map*

The Discharger's current Storm Water Pollution Prevention Plan ("SWPPP") and Site Map for the Facility are inadequate and fail to comply with the requirements of the General Permit as specified in Section X of Order No. 2014-0057-DWQ, as follows:

(a) The Site Map does not include the minimum required components for Site Maps as indicated in Section X.E of the General Permit, including (1) the flow direction of each drainage area; (2) on-facility surface water bodies; (3) areas of soil erosion; (4) nearby water bodies such as rivers, lakes and creeks; (5) locations of storm water

collection and conveyance systems, associated discharge locations and direction of flow; (6) sample locations if different than the identified discharge locations; and (8) locations where materials are directly exposed to precipitation and the locations where identified significant spills or leaks have occurred;

(b) The SWPPP fails to discuss in specific detail Facility operations, including its SIC Code and hours of operations (Section X.D.2.d);

(c) The Minimum Best Management Policies (BMPs) as indicated in the SWPPP are insufficient and do not comply with the minimum required categories as listed in the General Permit, which include Good Housekeeping, Preventive Maintenance, Spill and Leak Prevention and Response, Material Handling and Waste Management, Erosion and Sediment Controls, Employee Training Program and Quality Assurance and Record Keeping (Section X.H.1);

(d) The Advanced BMPs as identified in the SWPPP are inadequate to comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in the Facility's storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability, including Exposure Minimization BMPs, Storm Water Containment and Discharge Reduction BMPs or Treatment Control BMPs (Section X.H.2);

(e) The SWPPP fails to include a BMP Summary Table summarizing each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants and the BMPs being implemented (Section X.H.4 and X.H.5);

(f) The SWPPP fails to include an appropriate Monitoring Implementation Plan, including a discussion of Visual Observations, Sampling and Analysis and Sampling Analysis Reporting (Section XI);

(g) The SWPPP fails to include an appropriate discussion of drainage areas and Outfalls from which samples must be taken during Qualified Storm Events (Section XI);

(h) The SWPPP fails to include the appropriate sampling parameters for the Facility (Table 1, Section XI); and

(i) The SWPPP fails to include in the SWPPP detailed information about its Pollution Prevention Team (Section X.D);

(j) The SWPPP fails to discuss the Annual Comprehensive Facility Compliance Evaluation (Section X.A.9);

(k) The SWPPP is invalid because it was not certified and submitted by the Facility's Legally Responsible Person.  In fact, the SWPPP was not certified by anyone. Pursuant to Section XII.K of the General Permit, all Permit Registration Documents (PRDs), which includes SWPPPs, must be certified and submitted by a duly authorized Legally Responsible Person; and

(l) The SWPPP was prepared on November 12, 2010, and has not been revised since then to reflect the current Pollution Prevention Team, the current Legally Responsible Person and the requirements of the 2015 General Permit.

Failure to develop or implement an adequate SWPPP is a violation of Sections II.B.4.f and X of the General Permit.

### C. *Failure to Develop, Implement and/or Revise an Adequate Monitoring and Reporting Program Pursuant to the General Permit*

Section XI of the General Permit requires Dischargers to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting industrial activities. Dischargers have an ongoing obligation to revise the M&RP as necessary to ensure compliance with the General Permit.

The objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.  An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and it must be evaluated and revised whenever appropriate to ensure compliance with the General Permit.

1. Failure to Conduct Visual Observations

Section XI(A) of the General Permit requires all Dischargers to conduct visual observations at least once each month, and sampling observations at the same time sampling occurs at a discharge location.

Observations must document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, odor and the source of any pollutants.  Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants in storm water discharges.

EDEN alleges that between July 1, 2015, and the present, the Discharger has failed to conduct monthly and sampling visual observations pursuant to Section XI(A) of the General Permit.

2.   Failure to Collect the Required Number of Storm Water Samples

In addition, EDEN alleges that the Discharger has failed to provide the Regional Water Board with the minimum number of annual documented results of facility run-off sampling as required under Sections XI.B.2 and XI.B.11.a of Order No. 2014-0057-DWQ, in violation of the General Permit and the CWA.

Section XI.B.2 of the General Permit requires that all Dischargers collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

Section XI.C.6.b provides that if samples are not collected pursuant to the General Permit, an explanation must be included in the Annual Report.

As of the date of this Notice, the Discharger has failed to upload into the SMARTS database system:

a.   Two storm water sample analyses for the time period July 1, 2015, through December 31, 2015. Qualified Storm Events occurred in the vicinity of the facility on at least the following relevant dates:  11/2/15, 11/9/15, 11/15/15, 11/24/15, 12/3/15, 12/10/15, 12/13/15, 12/18/15, 12/20/15, 12/24/15, and 12/28/15.

b.   Two storm water sample analyses for the time period January 1, 2016, through June 30, 2016. Qualified Storm Events occurred in the vicinity of the facility on at least the following relevant dates:  1/5/16, 1/13/16, 1/15/16, 1/19/16, 1/22/16, 2/2/16, 2/17/16, 3/5/16, 3/10/16 and 3/20/16;

c.   Two storm water sample analyses for the time period July 1, 2016, through December 31, 2016. Qualified Storm Events occurred in the vicinity of the facility on at least the following relevant dates:  10/14/16, 10/27/16, 10/30/16, 11/19/16, 11/26/16, 12/8/16, 12/10/16, 12/15/16, and 12/23/16.

d.   Two storm water sample analyses for the time period January 1, 2017, through June 30, 2017. Qualified Storm Events occurred in the vicinity of the facility on at least the following relevant dates:  1/2/17, 1/7/17, 1/10/17, 1/12/17, 1/18/17, 1/20/17, 2/2/17, 2/6/17, 2/16/17, 2/20/17, 3/4/17, 3/20/17, 3/24/17, 4/6/17, 4/12/17, 4/17/17 and 4/19/17.

e.      Two storm water sample analyses for the time period July 1, 2017, through December 31, 2017.  Qualified Storm Events occurred in the vicinity of the facility on the following relevant dates:  10/19/17, 11/4/17, 11/8/17, 11/16/16, and 11/26/17; and

f.      Two storm water sample analyses for the time period January 1, 2018, through June 30, 2018.  Qualified Storm Events occurred in the vicinity of the facility on at least the following relevant dates:  1/3/18, 1/5/18, 1/8/18, 1/22/18, 1/24/18, 2/28/18, 3/1/18, 3/12/18, 3/20/18, 3/24/18, 4/5/18, 4/11/18, and 4/16/18.

### D.   *Failure to File Annual Reports*

The Discharger has failed to comply with Section XVI.A of the General Permit, which provides as follows:  "The Discharger shall certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS."

The Discharger's Annual Report for the reporting year 2014-15 was due on or before July 15, 2015.  On April 14, 2016, the Regional Water Board issues a Notice of Noncompliance to the Discharger for its failure to submit an Annual Report for the reporting period 2014-15. However, the Discharger failed to file the Annual Report until May 23, 2016.

The Discharger's Annual Report for the reporting year 2015-16 was due on or before July 15, 2016.  To date, the Discharger has failed to file its Annual Report for the reporting year 2015-16.

The Discharger's Annual Report for the reporting year 2016-17 was due on or before July 15, 2017.  On September 12, 2017, the Regional Water Board issued a First Notice of Non-Compliance to the Discharger for its failure to submit its Annual Report for the reporting period 2016-17. To date, the Discharger failed to file its Annual Report for the reporting year 2016-17.

### E.   *Deficient BMP Implementation*

Sections I.C, V.A and X.C.1.b of the General Permit require Dischargers to identify and implement minimum and advanced Best Management Practices ("BMPs") that comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability.

EDEN alleges that the Discharger has been conducting industrial activities at the site without adequate BMPs to prevent resulting non-storm water discharges.  Non-storm water

discharges resulting from these activities are not from sources that are listed among the authorized non-storm water discharges in the General Permit, and thus are always prohibited.

The Discharger's failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each and every day the Facility discharges storm water without meeting BAT and BCT.

### *Specific BMP Deficiencies*

On December 22, 2017, the Facility was inspected by the San Francisco Bay Regional Water Quality Control Board. During that inspection, the Water Board inspector observed sediment tracking with the facility and noted that the asphalt parking lot was breaking up at multiple locations and forming pot holes.

## *F.  Discharges In Violation of the General Permit*

Except as authorized by Special Conditions of the General Permit, Discharge Prohibition III(B) prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. Unauthorized non-storm water discharges must be either eliminated or permitted by a separate NPDES permit.

Information available to EDEN (including its review of publicly available storm water data) indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

EDEN alleges that the Discharger has discharged storm water containing excessive levels of pollutants from the Facility to its Receiving Waters during at least every significant local rain event over 0.1 inches in the last five (5) years.

EDEN hereby puts the Discharger on notice that each time the Facility discharges prohibited non-storm water in violation of Discharge Prohibition III.B of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

## *G.  Failure to Comply with the Mandates of a Water Board Violation Notice*

Pursuant to Section XIX of the General Permit, Regional Water Boards have general authority to enforce the provisions and requirements of the General Permit, including reviewing SWPPPs, Monitoring Implementation Plans, ERA Reports, and Annual Reports and requiring Dischargers to revise and re-submit PRDs, conducting compliance inspections, and taking enforcement actions.

On December 22, 2017, an inspector from the Regional Water Quality Control Board spoke with the Facility Manager who indicated that the Facility's designated Legally Responsible Person (LRP) Daniel Carroll was no longer with the Facility. The inspector informed the Facility Manager that a new LRP needed to be designated right away. To date, the Facility has failed to designate a new LRP.

### H. *Failure to Update Legally Responsible Person*

The Facility applied for NPDES coverage under the General Permit on December 18, 2015. The NOI Application indicated that the Legally Responsible Person was "Daniel Carroll." However, as confirmed by the Regional Water Board, Mr. Carroll is no longer employed by the Facility.

Section XII.K of the General Permit provides:

1. All Permit Registration Documents (PRDs) for NOI and NEC coverage shall be certified and submitted via SMARTS by the Discharger's Legally Responsible Person (LRP). All other documents may be certified and submitted via SMARTS by the LRP or by their designated Duly Authorized Representative.

2. When a new LRP or Duly Authorized Representative is designated, the Discharger shall ensure that the appropriate revisions are made via SMARTS. In unexpected or emergency situations, it may be necessary for the Discharger to directly contact the State Water Board's Storm Water Section to register for SMARTS account access in order to designate a new LRP.

3. Documents certified and submitted via SMARTS by an unauthorized or ineligible LRP or Duly Authorized Representative are invalid.

All Permit Registration Documents, including updated SWPPPs, uploaded by unauthorized or ineligible LRPs or Duly Authorized Representatives for the Discharger are thus invalid.

The Discharger may have had other violations that can only be fully identified and documented once discovery and investigation have been completed. Hence, to the extent possible, EDEN includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

The violations discussed herein are derived from eye witness reports and records publicly available. These violations are continuing.

## IV.    THE PERSON OR PERSONS RESPONSIBLE FOR THE VIOLATIONS

The entities responsible for the alleged violations are Latpalo Enterprises, Inc., dba JL Precision, as well as employees of the Discharger responsible for compliance with the CWA, and Michael Laptalo, Jacov Laptalo and the Laptalo Family Trust, the Property Owners.

## V.    THE DATE, DATES, OR REASONABLE RANGE OF DATES OF THE VIOLATIONS

The range of dates covered by this 60-day Notice is from at least July 1, 2015, to the date of this Notice.  EDEN may from time to time update this Notice to include all violations which may occur after the range of dates covered by this Notice.  Some of the violations are continuous in nature; therefore, each day constitutes a violation.

## VI.    CONTACT INFORMATION

The entity giving this 60-day Notice is Eden Environmental Citizen's Group ("EDEN").

Aiden Sanchez
EDEN ENVIRONMENTAL CITIZEN'S GROUP
2151 Salvio Street #A2-319
Concord, CA  94520
Telephone:  (925) 732-0960
Email:  Edenenvcitizens@gmail.com  (emailed correspondence is preferred)

EDEN has retained counsel in this matter as follows:

CRAIG A. BRANDT
Attorney at Law
5354 James Avenue
Oakland CA, 94618
Telephone:  (510) 601-1309
Email:  craigabrandt@att.net

To ensure proper response to this Notice, all communications should be addressed to EDEN's legal counsel, Mr. Craig A. Brandt.

## VII.    RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

As discussed herein, the Facility's discharge of pollutants degrades water quality and harms aquatic life in the Receiving Waters.  Members of EDEN live, work, and/or recreate near

the Receiving Waters.   For example, EDEN members use and enjoy the Receiving Waters for fishing, boating, swimming, hiking, biking, bird watching, picnicking, viewing wildlife, and/or engaging in scientific study.   The unlawful discharge of pollutants from the Facility impairs each of these uses.

Further, the Facility's discharges of polluted storm water and non-storm water are ongoing and continuous.   As a result, the interests of EDEN's members have been, are being, and will continue to be adversely affected by the failure of the Discharger and Property Owner to comply with the General Permit and the Clean Water Act.

CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for un-permitted discharges of pollutants.   33 U.S.C. §§ 1365(a)(1) and (f), §1362(5).

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five (5) years prior to the date of the Notice Letter.   These provisions of law authorize civil penalties of $37,500.00 per day per violation for all Clean Water Act violations after January 12, 2009, and $51,570.00 per day per violation for violations that occurred after November 2, 2015.

In addition to civil penalties, EDEN will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.   Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), EDEN will seek to recover its litigation costs, including attorneys' and experts' fees.

## VIII.    CONCLUSION

The CWA specifically provides a 60-day notice period to promote resolution of disputes. EDEN encourages the Discharger, the Property Owner or their counsel to contact EDEN's counsel within 20 days of receipt of this Notice to initiate a discussion regarding the violations detailed herein.

60-Day Notice of Intent to Sue
June 22, 2018
Page 13 of 13

During the 60-day notice period, EDEN is willing to discuss effective remedies for the violations; however, if the Discharger wishes to pursue such discussions in the absence of litigation, it is suggested those discussions be initiated soon so that they may be completed before the end of the 60-day notice period. EDEN reserves the right to file a lawsuit if discussions are continuing when the notice period ends.

Very truly yours,



AIDEN SANCHEZ
Eden Environmental Citizen's Group

Copies to:

Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Executive Director
State Water Resources Control Board
P.O. Box 100
Roseville, CA 95812-0100

Jeff Sessions, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Regional Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Executive Director
San Francisco Bay Regional Water Quality Board
1515 Clay Street, Suite 1400
Oakland, CA 94612